Good morning again. May it please the court. My name is Eitan Casteljanich and I'm representing Cindy Nguyen in this appeal. Nguyen has been diagnosed with schizophrenia and depression and has been receiving mental health treatment for many years. The main issue before this court is similar to the other case I argued this morning with a twist. It's whether the ALJ properly determined that Nguyen had no severe impairment prior to her date last insured of December 31st, 1997. That's the difference. She would have to prove that the severe impairment began no later than that date when her insurance expired. Once again, at step two, which is where this case was decided by the ALJ, Nguyen was required to show that the combination of her impairments more than minimally affected her ability to from a medical expert who testified at the hearing, Dr. Johnson, who stated that based on the medical evidence alone, he felt that she met the listings as far back as 2000, which is the earliest medical record here. The medical records in this case only go back to June of 2000 because it appears that Ms. Nguyen's prior care provider, a nurse practitioner, she closed her practice, the records had gotten destroyed, they could not be found. So we're left having to infer the correct disability onset date here. We've got medical evidence, medical expert testimony that she's disabled. Counsel, in spite of the fact that the records are no longer available, doesn't your client still bear the burden of proof with respect to the onset date? She's still, well, generally speaking, disability claimants bear the burden of coming forward with evidence all the way through. Right, but if there's no evidence, it's harder for her, regardless of the reason. It's not her fault, but there isn't treatment evidence from the time period when you're alleging the onset. That's correct, but what there is here is a Social Security ruling which Social Security has issued and which the ALJ was required to follow. Under the clear language of Social Security ruling 8320, in a case like this where there's evidence showing disability at a later date, but there's no medical evidence that goes back far enough, an ALJ, and I'm going to quote, explore other sources of documentation. Information may be obtained from family members, friends, and former employers to ascertain why medical evidence is not available for the pertinent period. We know why the medical evidence wasn't available. The question is whether the ALJ's ultimate conclusion is supported by the reasons given, including that in 2000, your client denied having had a psychiatric disorder earlier, and that her husband testified that she could perform a very wide range of activities before the date was ensured. So why isn't that substantial evidence? I need to finish what I was saying because I didn't get to the most important and most important part of that. The ALJ is required to explore other sources of documentation in order to furnish additional evidence regarding the course of the individual condition. In other words, the ALJ can also rely on lay testimony, on testimony of the claimant, on other evidence when there isn't medical evidence alone in order to infer. But the ALJ did that. That's exactly what I was, that's exactly why I asked you what your client's own statements and her husband's own statements as descriptive of what her condition was before the date last ensured. Well, first of all, it's not just a cultural thing. I think even in our culture, to admit that you are schizophrenic is not something that's taken lightly or that a professional person would ever choose to do. And that's, I think, was part of what was going on here is that she was very much in denial of the severity of her illness when she told the doctor, no, I haven't had this before. She didn't want anyone to know. But what we do have is lay evidence from one of the teachers, who was the teacher of one of her children, from the time period... The problem with that evidence, which is quite strong, but isn't tied, the strongest part of it is not tied to a time period, i.e. she showed up at my house and she was falling apart and I told her she had to get help and all that. We don't know when that was. Well, that part of it isn't tied to a time period, but the part about which grade her son was in when she was coming into the classroom and crying... Well, I understand that, but that didn't seem to me to support a conclusion. I mean, it supported a conclusion that this woman was terribly stressed out and having a hard time, but whether it supported a conclusion that she had schizophrenia is another question. It might not... Or anything like it. Well, there's two different diagnoses here. One is schizophrenia and one is depression with psychosis. Those have both been diagnosed here. And the behavior in a classroom, to cry uncontrollably, is something that would... It would meet the more than... The step two issue here of did she show... Was there evidence that she had an impairment that more than minimally affected her ability to work? But the more important issues, I think, is her husband's lay testimony about how during that time period, how she was eating rotten food. I mean, he's got a list of things where she was very dysfunctional, and yet she... But she was also caring for the children, playing the piano, balancing the family checkbook, driving, and doing a variety of other relatively complicated tasks, according to her husband. Okay. First of all, people with schizophrenia drive cars. People with schizophrenia have children. People with schizophrenia take their children to school and back. But some of the people with schizophrenia, when they're at that school, break into tears uncontrollably and can't really function there. So it's not... Once again, I'm not asking the court to rule that Wynne was disabled during that time period. I'm asking the court to rule that the ALJ erred by failing to adequately consider all of the other evidence which shows that Wynne had mental impairments that more than minimally affected her ability to work during that time frame. The ALJ only gave one reason for rejecting Wynne's testimony, and that reason is clearly improper under Ninth Circuit law. It is basically circular reasoning, saying, I find she's not credible because, to the extent that she described limitations greater than my residual functional capacity assessment, or greater than my finding that she didn't have a severe impairment. And that's just circular reasoning. That does not pass any kind of scrutiny. Similarly, the ALJ did not even mention the teacher's lay statement. The ALJ gave reasons, one reason for rejecting her husband's testimony, but that reason... Did the husband actually testify that she was able to take care of the kids? His definition of take care of the kids, was she walking to the court? No, let's see. She walked out of the house to pick Wesley up, because she was dropped out in front of the house, but she couldn't cook, and she could wash clothes, but basically she was able to maintain the basics like washing clothes, taking the kids in and out of school, and balance the checkbook. That's all she did was balance the checkbook. I don't see where that's not a definition of taking care of the kids, really. Well, no, there's so much... Do you see anything more than that? I don't know where they got the idea that she was able to take care of the kids. In fact, the autistic kid was put in a foster home in 2000. That was by 2000, because she couldn't take care of him. Yes, her activities, she did not just... There were days she spent most of her time in bed, but she didn't do absolutely nothing at all, but her activities don't show, they don't show that she could have done work activity outside of the home, that she could have successfully left the home and maintained any kind of schedule. None of that's evident here. Well, yes, but the problem here is that you have so little in the way of affirmative medical evidence. You have essentially a professional guess, and so you need to rely on the lay evidence more strongly than usual. It has to be not simply non-contradictory, but actually consistent. Well, one of the issues here that I know the government will bring up, they brought it up in their brief, is that at the hearing, the medical expert was asked whether or not based just on the medical evidence to describe his opinion about whether or not she met or equal to listing, and he said she did since the date of the medical evidence, but based on the medical evidence alone, he couldn't go any further back than that because there was none. That evidence actually brings into play Social Security ruling 8320, and it doesn't support a finding that prior to that date, she did not have a severe impairment. Once again, we're back to the severe impairment dance here because it's all about whether or not there was evidence prior to the date last insured that showed that she had a mental condition that more than minimally affected her ability to work, and she met that standard because because the ALJ didn't give any valid reason to reject her testimony, this court should credit her testimony as true, and credit it as true, it does show that she had mental limitations prior to her date last insured. When there was a finding that she played the piano at the time, is there any evidence that she did play the piano at that time? I don't know. There was evidence that she used to love to play the piano, but where does it say that at that time she played the piano? I don't know how much she was still playing the piano then, but once again, the ability to sit down at the piano and play some piano, that doesn't mean she can leave the home and go to work, doesn't mean she has no mental functional limitations at all. I understand that, but I asked you a question because I don't see where it says that she was playing the piano, but you don't know. I don't see clear evidence of the amount that she played the piano at that time, no. I'm just wondering where these conclusions came from about what she could do at the time. I would like to reserve some time for rebuttal, please, unless you have any other questions. That's fine. Thank you. Thank you. Good morning, Your Honors. Tom Elsberry for the Acting Commissioner of Social Security. I would like to start out first clarifying the definition of what a severe impairment is. According to the regulation, it's defined as any impairment or combination of impairments which significantly limits, not more than minimally, but which significantly limits the claimant's physical or mental ability to do basic work activities. That's the regulatory definition of severe impairment. So where does the more than minimally language come from that the petitioner, that the appellant's been... I'm not sure. I thought it came from a case. I thought it came from a case. I believe it probably came from case law, a paraphrase of the actual regulation, but I believe the regulation is the source for the definition. I also want to go on to clarify Social Security Ruling 8320. There's kind of a sleight of hand here which counsel has recognized. The medical expert did testify that he thought she could equal 1203 or 1204 listing in 2000, but SSR 8320 requires there to be a finding of disability, and after that finding of disability, an ALJ, if there's any gray area like there is here about the onset date, the ALJ has to develop the record as was discussed to infer an onset date. So first off, 8320 is not even on point for the facts of this case, and as Judge Graber noted, that's what the ALJ did here. He called an M.E. to further develop the record. He addressed Dr. Diaconu's treatment notes and opinion about the retrospective nature of the impairment, and then he also addressed Mr. Wynn's testimony. I want to address some of the other questions that were raised as well about that unaddressed testimony. Ms. Wise, the teacher, who the ALJ did not address, which we acknowledge is error, but we argue is harmless, there is difficulty in determining what time period she's testifying to. But, in fact, it becomes clear if you cross-reference it with the record, which the ALJ did not because he didn't discuss it, and then he didn't have access to the second one, which came just to the Appeals Council. Ms. Wise says at one time that Ms. Wynn came to her door on the edge of a nervous breakdown. This is in her letter to the Appeals Council, but this clearly occurred in 2000 when she had her psychotic breakdown. Why did it clearly occur in 2000? Because in her second letter to the Appeals Council, she says one son was in foster care and the other son was in high school. In 1997, they were in third grade and first grade, I believe. But in her second letter, she provides a date for that nervous breakdown at the door. She furthers on to say that Eric was now in the fifth or sixth grade in, yeah, that's the younger one, I'm sorry. The younger son was in sixth grade, 1999 to 2000, and that's when he went to the foster home. So that shows that he was in third grade in 1997. In addition, the testimony by when Ms. Wynn had her breakdown in 2000, she reported that she had had no previous psychiatric care. Her husband was there as well at the same time, and he reported he was surprised. He was aware of some strange activity, but he wasn't aware of the extent that she was describing in 2000. And in fact, Ms. Wynn herself attributed the 2000 episode to the stress of admitting her autistic son into foster care. And the voices that she experienced in 2000 never returned. And you can find that in a report to a medical professional in 2004. That's at page 335. I want to address Dr. Diaconu's retrospective letters. The letter to the ALJ only said that based on the clinical research regarding schizophrenia, it was likely that it went back to 1997 or prior to 1997. And the ALJ reasonably noted that it was a conclusory statement and that it was not supported by her treatment notes. And a review of the treatment notes, and a medical expert agreed with that as well. The ALJ asked the medical expert, is there any indication in her treatment notes that this would support a speculation that it dates back to pre-97? And the medical expert said no. The subsequent letter by Dr. Diaconu states that she's basing it on history from the husband, from her work experience, and from the family impairment history, or history of mental impairment within the family. The problem with, depending on the husband, is first, at the initial meeting with, when Dr. Diaconu met with Ms. and Mr. Wynn, she listed them as poor historians. That they, which... Listed as what, I'm sorry? Pardon me? I didn't hear what you said. Poor historians? Poor historians, yes. Right. And which doesn't really give any weight to basing it being prior to 1997 based on his reporting. In addition, when she was checked in in 2000 for her psychotic break, it's reported that the husband was not aware of any really extreme, strange behaviors prior to 2000. The... How much of that is due to the fact that the husband reported he didn't spend a lot of time with his wife? That's an important point. The husband worked, I think a lot of it is due to that. I think a lot of his deficiency as a historian, medical historian, is he works 10 to 11 hour days. And in fact, in the critical period, he left Pennsylvania in March of 1997. And she stayed and took care of two high needs, special needs children by herself through September 1997. And then, it was then that she met Ms. Wise when she finally did move to Seattle and got... Ms. Wise was the teacher in Seattle. So that was one, when they first met Ms. Wise was three months before the end of the date last insured. But as far as the father's or Mr. Wynn's ability to observe, he was either not there very much because of how much he was working or he was not there at all for at least three, four months, six months actually before. By the way, to go back for a minute to her denial in 2000 that she had a history of psychiatric disorder. What it actually says is she denies any significant previous history of psychiatric disorder. We have no clue what that means. It just means she never went to the hospital before, right? That's true. And in fact, I will then focus again on the word significant because the real definition according to the regulation and also cited in Barnhart v. Thomas, the Supreme Court case, any impairment or combination of impairments which significantly limits... Well, I understand that, but different people use the word differently. That's true. That's true. I think we are forced to look as deeply as we can. I think as the M.E. commented during testimony, he was completely immersed in the case. When you're dealing with a case where there's three years of no records and then there's no apparent treatment and then a breakdown in 2000, three years later, two years to be fair, and then a doctor seeing her nine years later and saying, oh, this is retrospective, it requires, I think, that detailed of an analysis of the facts. And yes, I agree. It might be true that a layperson would use significant differently. But then I also don't know if that was Ms. Winn's word or the medical professional who's evaluating her at intake and asked her about what her experiences were with psychiatric problems and her answer qualified under that. Medical professionals used the word significant. So there's no dispute that in 2000, Ms. Winn suffered a breakdown, correct? And then she was receiving treatment from this other doctor who retired from 97 to 2000, is that right? That's what is stated. There's no evidence in the record of treatment with Pamela Shapiro is the nurse's name. There's just the statement that she was receiving treatment. Which would be consistent with the ultimate event in 2000, that in 2000 she has a breakdown to the extent that she's claiming that from 97 to 2000 she was receiving treatment. That would be reasonable to assume that she was receiving treatment before that breakdown. True. And as counsel noted, there's another diagnosis here, depression with a psychotic break. So you can be depressed and still be able to go to work. The question is, is it a severe limitation? And that's where we are lacking any evidence whatsoever. Other than from Ms. Winn herself, correct? She testified that she had been hearing voices in 97. She testified that she had been having these issues going back to 94, correct? Okay, so yes she did. The hearing voices, though, she said in 2004 only happened in 2000. And that the psychotic break in 2000 only occurred because of the stress from putting her son in foster care. Those are her words to other medical professionals. So her words that she was hearing voices, she didn't say she heard voices in 97. In the testimony, it's unclear what the time frames are. Both, I don't recall if she mentions this in testimony, but Mr. Nguyen mentions an odd episode when she's laying on the grass and sitting on the grass in front of her house and she's reading a book. And something strange happened. She thought a bird was attacking her or something like that is how she describes it. But her neighbor told Mr. Nguyen that she was acting, excuse me, crazy or something like that. Wacko I think was the term. However, in a report, let me find where this is, she actually says that happened in 2000. And that was right before the psychotic break that led to her admission in 2000. Let's see. He said it happened in 97. He was talking about the pre-98 period, right? They were constantly reminded to talk about the pre-98 period, but much of what was said was clearly dealing with the 2000s. Let's see. For example, you'd asked about Mr. Nguyen and the piano and the activities. Sorry. That's fine. Go ahead. I'm sorry, I think I've strayed from your question. Your question was, was there testimony regarding the pre-1997? And I think as I pointed out, the report of voices was not in 97, it was 2000. She reported that to a care provider. The breakdown was because of admitting her son into foster care. There is no evidence of significant limitation prior to 2000. She herself denied any significant limitation, and regardless of whether we use the lay term or a technical term, I think under these facts, it strongly suggests that they've not met their burden to show a severe impairment prior to 1997. At the very least, it allows for different interpretations. And the ALJ's reading of the record, as sparse as the record is, is reasonable. And regardless of if there are other alternative interpretations, if the ALJ's interpretation is reasonable, then her decision is entitled to deference. And I believe that's all I have, if you have no further questions. Thank you very much. Thank you. Thank you. Let me start by saying that not only is there a long line of Ninth Circuit decisions that define the Step 2 standard as more than minimally affect the ability to perform any basic work activity. There's also Social Security ruling 96-3P, which says, if the adjudicator finds that such symptoms cause a limitation or restriction having more than a minimal effect on an individual's ability to do basic work activities, the adjudicator must go on to the other steps. It's Social Security's own rules. We're not talking significant doesn't tell the whole story here. The details are in Social Security's rules. With regard to the idea of whether or not the ALJ's analysis was reasonable, here's a problem. In her decision, even though Social Security ruling 83-20 says that she's got to look at all of the evidence in order to infer an onset date, the ALJ wrote in her decision, as for the opinion evidence, virtually all that exists in the file pertains only to the period after June 2000, which is not an issue here, therefore they will not be discussed. The ALJ even came right out and said... But she did go on to discuss the one doctor who did make a retroactive statement. She did. She discussed that one. But there were others that she did not discuss and that are consistent. And so the relevance of the later period is simply to demonstrate the severity of her illness at that point, to support the notion that she probably started earlier? I mean, what is the pertinence of it? That's precisely true. It's to show the total consistency. There were two other treating physicians, both of whom opined that she had very significant schizophrenic symptoms and yet... And that was to provide support for the only retroactive opinion here, which is from Dr. Diaconu, which then... But the ALJ essentially found that. Didn't he find that she had significant... Didn't he essentially say, if I was looking at 2000, of course, she would pass the Step 2? No, more exactly, she said that because she didn't need to consider whether or not she was disabled in 2000, she didn't go there. She said there's a diagnosis of probable schizophrenia, but didn't go beyond that, because she didn't have to. Unless you can prove that you have a severe impairment prior to the date last insured, there's no case here. But she did prove that through her testimony, which was improperly discredited, through the lay evidence, through the retroactive opinion of Dr. Diaconu, which is especially strong in the additional explanation that was then provided after the ALJ turned the case down. Her hearing attorney went back to Dr. Diaconu and said, look, you didn't talk about whether or not... specify the severity back far enough, and she wrote a new opinion. And that evidence actually supports remand as well, because it too shows that the ALJ's Step 2 finding is not supported by substantial evidence. Okay, thank you very much. Your time is up, and we will submit the case. Judge Boothorn, if I might request about a five-minute break. I will not hang up. Somebody needs to call me back. And I was about to make the same suggestion. Yes, sir, you're concluded. You may sit down. Thank you.
judges: Graber, Berzon, Curiel